We'll hear argument first this morning in Case 22-174, Groff v. Postmaster General Louis DeJoy. Mr. Street? Mr. Chief Justice, and may it please the Court, Title VII requires religious accommodations absent an undue hardship on the conduct of the employer's business. TWA v. Hardison violates the statute's promise that employees should not be forced to choose between their faith and their job. Hardison's de minimis test makes a mockery of the English language, and no party truly defends it today. Fortunately, Hardison's test is dicta as to Title VII, so the Court can and should construe undue hardship according to its plain text to mean significant difficulty or expense. But even if Hardison applied Title VII, its de minimis test lacks precedential force because it was barely considered by the Court, and its neutrality-based rationale has been devastated by Abercrombie. The government's new patchwork test is little better than Hardison's. It allows employers to deny accommodations far short of any fair meaning of undue hardship. The government believes undue hardship arises whenever there is lost efficiency, weekly payment of premium wages, or denial of a co-worker's shift preference. Thus, under the government's test, a diabetic employee could receive snack breaks under the ADA, but not prayer breaks under Title VII, for that might cause lost efficiency. An employee could receive weekly leave for pregnancy check-ups, but not to attend Mass, for that might require denying a co-worker's shift preference or paying premium wages. There's no reason religious workers should receive lesser protection than those covered by other accommodation statutes. We know a significant difficulty or expense test works because several states, including New York and California, already apply that test for religious accommodations, and federal courts are well acquainted with applying that test under the ADA and other similar statutes. The Court should establish a textual test for undue hardship and reverse the judgment below. I welcome the Court's questions. Just a couple of clean-up questions. What was actually decided? Was the law being considered in Hardison? Was it the Title VII as amended, or was it a guideline? It was the EEOC guideline that implemented the pre-amendment statute. So the law actually was not interpreted in Hardison? That's correct, Your Honor, because the events in Hardison arose before the statute was amended, and the Court squarely stated that it was applying the guideline. The other thing is you say that the government is not making the de minimis argument. So what is the daylight between your argument now and the government's argument? It is best explained by what the government thinks arises to the level of an undue hardship. They use a variety of different formulations, but when the rubber meets the road, that's where we see the daylight. And we see that the government believes that any loss of efficiency is going to be an undue hardship, any regular payment of premium wages, for example, paying overtime to one person per week to attract that person to cover a Sabbatarian shift, the denial of a single co-worker's secular preference, according to the government, is an undue hardship. So when we take all of that together, while the government's test might sound better than Hardison's on its face, it would have the effect of eviscerating certainly any Sabbatarian observance, which was at the very core of what the Congress was trying to protect. So one final question. It seems a little odd that under the ADA we have the same term, undue hardship. And I know there's a definition of undue hardship there, but it seems as though that there would at least be some comparison to the undue hardship, the treatment of undue hardship under ADA, and there would be some similarity with Title VII. So would you comment on that? Yes, Your Honor. There's right now a huge gap between the accommodations allowed under the ADA and the accommodations allowed under Hardison. And to be clear, we'd be making the same argument here if the ADA wasn't out there because we believe the best plain text meaning of undue hardship is significant difficulty or expense. But the fact that the ADA and this other web of accommodation statutes requires employers to accommodate for a variety of reasons and they know how to apply a significant difficulty or expense test bolsters our argument because Congress understood the plain meaning of undue hardship to mean significant difficulty or expense, and that's what it wrote into those statutes. It seems to me we might be getting a little ahead of ourselves in talking about the ADA standard or some others. The first question presented just says whether or not the test applied in Hardison is an appropriate test, their interpretation of undue burden. We don't have to address the second issue, do we? Your Honor, certainly addressing question presented one will solve 90 percent of the problems. We do think the court should answer question presented two because that establishes the yardstick against which the quantum in QP1 is going to be answered. So there are seven or eight circuit courts that have said that an undue hardship on an employee or a co-worker is itself an undue hardship on the conduct of the business. We believe this court would appropriately advise those lower courts that that's not correct and that the correct metric is the conduct of the business. Well, there are differences between ADA cases, USERA cases, Pregnancy Work Act cases. They apply to a fairly discrete category of individuals. Title VII obviously has a broader scope, and I'm wondering if that's the sort of issue that we need to address here. It seems to me there's enough on our plate, perhaps, with respect to the undue burden standard. Your Honor, we don't disagree. We would be fine with an opinion that doesn't say anything about the ADA or those other statutes but just interprets the plain text that the court so clearly eviscerated in Hardison. And we think that, again, the ADA and these other statutes just confirm the plain meaning. While there are certainly differences as to all of the types of accommodations under the different statutes, Congress chose the same basic undue hardship metric for all of them. Excuse me. You are really asking us to overrule not just the de minimis test but the entire holdings of Hardison. You appear to be saying that the three holdings of Hardison, as I understood them to be, one, that it would be an undue hardship if an employer has to breach its collective bargaining agreement. I didn't see you arguing that in your brief, but you just said it here today in your opening. Am I correct? You want us to overrule that part of Hardison? No, Your Honor, because we don't think that is the holding of Hardison. Hardison is limited to seniority systems, and that was based on a hard- That's assuming you're right on that. And that issue wasn't addressed by the Third Circuit, whether the MOA here was that. But are you conceding that it's an undue burden to violate a collective bargaining agreement seniority system? Yes, Your Honor, we- So you're ignoring Hardison's language then that said any other type of agreement would impose- violation of any kind of agreement would violate- would be a substantial burden. While there is some broader language in Hardison, we believe the best reading of that- So let me go to the second. Paying premium wage. You said that even if they had to pay it year-round, that is not an undue burden. That's not what Hardison said. So you want us to overrule that. We agree that is inconsistent with the plain meaning of undue hardship. And finally, here's a man who applied for a job where he has to work Saturdays, Sundays, and holidays. And he applies and he says, well now I'm not working Sunday, and I'm not working religious holidays, because that's consistent with me, with my religion. And it's not an undue burden to force the employer to have to give other employees greater work, or to have to cover more days than it would normally have to cover, or to force people who also have the same job title to work every holiday and every Sunday. You're saying that can't be an undue hardship. That's not our position because that's not the facts of this case. He was an RCA. He was required to work Saturday, Sunday, and holidays. And now he doesn't want to work half the days he was hired to work. A few important factual clarifications. First of all, when Mr. Groff was hired, there was no Sunday delivery. But that's a little bit beside the point. The position of an RCA is defined at JA 144 in the record as being a non-career employee who fills in for career employees whenever needed. It's not specific to Sundays and holidays. That's actually a different position within the Postal Service known as ARCs. That was Sunday and holidays. That was Sunday and holidays. Mr. Groff's position is filling in throughout the week when another career employee is absent. So he did not sign up for a job specific to Sundays and holidays. And we concede that would be a very different case. With respect to the factual question of whether other employees were required to work more or work overtime, there's no evidence in the record of that. The evidence in the record is that individuals had to work on Sundays when they would prefer not to work. But that's just the nature of an accommodation. So you want us to overrule at least two of the three holdings are partisan. Yes, we don't think those two holdings are partisan. How do we import the language of the other statutes in defining undue hardship now when Congress, for at least between 1994 and 2013, declined to replace partisan with significant difficulty or expense? So now we're going to take language from another statute that Congress has decided itself not to adopt and to import it into the plain definition of undue hardship. Again, Your Honor, we're not seeking to import that language. We'd be making the exact same argument if those statutes didn't exist. But on your question about congressional acquiescence or trying to divine what Congress was up to there, there are none of the strong indicia of congressional acquiescence that this Court has looked to in other stare decisis cases. Congress did not amend the definition of religion. Congress did not overhaul Title VII while leaving hardship intact. Wait a minute. But it has overhauled at least twice overruled decisions of ours it didn't like. It did it in Patterson, and it did it in Mudbedder. So it has not been silent when it hasn't liked a definition that we've given something in the Civil Rights Act. In many other acts it remains silent, but not on this one. In Alexander v. Sandoval, this Court described what happened to Title VII as not being an overhaul of the statute but only amendments as to selected provisions from which there could not be any inferences drawn. Mr. Striefen, we don't really need evidence of congressional acquiescence, do we? I mean, this is a statutory stare decisis case. And we've said over and over that when there's a statute involved rather than the Constitution, stare decisis is at its peak. And this has been, you know, for decades. This has been the rule. Congress has had that opportunity to change it. Congress has not done so. You can count on, like, a finger how many times we have overruled a statutory ruling in that context. Two points on that, Your Honor. First, the starting point should be footnote one in Patterson v. McClain where the Court says, in a stare decisis case, mere congressional inaction is not sufficient for this Court to abide by an erroneous interpretation. And that's when the Court looks to other indicia of congressional acquiescence. This is a different stare decisis rule than any I've ever heard. I thought that our statutory stare decisis rule went like this. It doesn't really matter whether the thing is wrong. I mean, stare decisis only has a role to play when the ruling is wrong. If the ruling were right, we wouldn't need stare decisis. Stare decisis has a role to play even when, I mean only when, a ruling is erroneous. And still we say Congress has had a chance to. The ball was in Congress's court. Congress has not done it for reasons of predictability, for reliability, for reliance, for reasons of the credibility of the judicial system. We maintain what we said about what statutes mean. Even for statutory stare decisis, this Court looks at the enumerated factors, and this is the exceptional case where every factor weighs in favor of overruling. Not just the exceptionally poor quality of the reasoning in Hardison, not just the congressional acquiescence, which I won't hammer on any further, but the fact that the government's not even defending either the test and certainly not defending the rationale of Hardison, which was all about treating religious practices on a neutral level with secular preferences. Well, the SG can say or not what she's defending and what she's not. As I read the SG, she's saying that three words do not represent the core of Hardison's reasoning or the core of Hardison's holding, but that she is standing full square behind what she understands to be Hardison's actual reasoning and holding with respect to the facts there. But putting that aside, because I'm sure she will tell us about that, what factors are, you know, the reasoning is wrong. That's just another way of saying that the decision is wrong. That doesn't count when you're standing up there and saying that we should overrule a 40-year-old statutory precedent. Happy to talk about the factors, Your Honor. First of all, whether or not the government defends the test when it stands up here today, it is not defending the rationale. And a key factor this Court has looked at, including in Kimball v. Marvel, is whether the rationale has been eroded by later decisions of this Court. There is absolutely no good answer for why Abercrombie has not devastated the neutrality rationale. Abercrombie just said that Title VII insisted and required some kinds of accommodations. And there's nothing in Hardison that is inconsistent with that ruling. Hardison says sometimes accommodations are required, sometimes they're not. Now, you think that they should be required more often, but there's nothing in Abercrombie that's remotely inconsistent with Hardison. Abercrombie says sometimes accommodations are required. So does Hardison. I couldn't disagree more, Your Honor. I think if you read pages 83 and 84 in Hardison, the three sentences that follow this Court's enunciation of the de minimis test are all about that Title VII requires neutrality, and it's not appropriate to give a preference for religious reasons for not working on the weekend. Abercrombie completely reversed that understanding of Title VII, but even if you're not persuaded by that, Your Honor, certainly the reliance interests are very weak here. They're even weaker than they were in Janus because employers are always required to update their HR manuals to adjust to this Court's decision. Do you, Mr. Street, do you think that a change in this Court's understanding of the meaning of the religion clauses of the First Amendment is a relevant factor in determining whether the statutory interpretation in Hardison should be revisited? It's really hard to understand the decision in Hardison except as an exercise in constitutional avoidance. Although the Court didn't mention that concept in its opinion, that was very prominent in the briefs and in the oral arguments in Hardison. And a way to understand the adoption of the de minimis test was the view that the Establishment Clause, as interpreted in Lemon, which talked about anything that advances religion, would be violated by any departure from strict neutrality between employees who wanted a secular exemption and those who wanted a religious exemption. But Abercrombie and some of our later cases do make it clear that that is an incorrect interpretation of the Establishment Clause. So even though constitutional avoidance is not mentioned there, do you think that is a relevant factor? Yes, it's important for two reasons. First, the reason Your Honor mentioned, which we completely agree with, which is that there have been further erosions of the doctrinal underpinnings that seem to motivate Hardison. But second, and going back to the idea of what was Congress thinking here, if we're going to go down the path of trying to guess what Congress was thinking, it may very well have been that Congress felt hamstrung by this Court's Establishment Clause jurisprudence and didn't feel that it could adopt a heightened standard for undue hardship. In fact, there were witnesses in both of the hearings that spoke about that very question. Can I say I think that that's a... Sorry. Go ahead. No, please. No. You go first. I think that that's an unusual theory. It's good that Justice Kavanaugh interrupted me because I would have used a different word than unusual. I mean, now we're guessing as to what the Court may have thought in Hardison, which it never said in Hardison, or what Congress might have thought even though it never said it, that maybe everybody was motivated by an erroneous view of the Constitution, even though that erroneous view of the Constitution doesn't appear in any part of Hardison and doesn't appear in anything that we can point to in the Congressional record. And that's why we're going to overrule a statutory precedent because it might be using our sort of fortune-teller apparatus or our soothsayer apparatus that that might have been what was in people's minds. Your Honors, we are not the ones here asking for this Court to guess about what Congress is doing. It's our position that Congressional silence or inaction does not get you off the starting blocks. There has to be some affirmative evidence of Congressional acquiescence. My point is just if the Court's going to go down that road and guess at what was going on, that is at least as plausible an explanation as that Congress agreed with this Court's decision in Hardison. Congress, there's no House of Congress taking the vote, approving of the ruling in Hardison or refusing to disapprove of it. Can I just ask about Hardison itself? Because I think Hardison has to be interpreted in light of footnote 14, which talks about not de minimis costs but substantial expenditures or substantial additional costs. And if we assume, as the Solicitor General I think seems to say, that we should not use the term de minimis costs but we should use what's in Hardison, footnote 14, substantial costs, substantial additional costs, then that standard, substantial costs, substantial additional costs, is perfectly appropriate. Your answer to that? If you were just to say the word substantial costs in a vacuum, that sounds pretty good to me. The problem is when you look at how that was applied in Hardison... Okay, so I'm going to interrupt you there because I think there are two things going on here clearly. The formulation of the words of the test, and substantial, significant, who knows what those will mean. Where it really matters, and I think you're pointing this out correctly, is how do we apply it to a situation where you have to pay new workers, where you have to go short-shifted, where you have to violate a collective bargaining agreement or a memorandum of understanding. And those specifics, I think, are where it cashes out, so to speak. Do you agree with that? I do agree with that, Your Honor, and we're not just talking about, of course, opportunities of short-shiftedness or shorthandedness or talking about hiring new employees. We're talking about just paying premium wages to get existing employees to voluntarily work or just scheduling. In this case, you're talking about? Well, in this case and in general, the government's position and the holding of Hardison has to do with paying voluntary premium wages to attract somebody to work. Right. In this case, just to talk about that for a minute, do you agree that the post office was violating the MOU? No, we don't, Your Honor. And why not? We explain that in our reply brief because the MOU does not spell out an exclusive list of opportunities to avoid Sunday scheduling, and so we think it should be read in conjunction with the Title VII duty to accommodate. If it did violate the MOU, would you lose? No, Your Honor, because Congress knows how to carve out provisions to declare them not to be an unlawful employment practice. It did that with the seniority systems in Section 703G that Hardison talked about. It did not extend that to all collective bargaining provisions. And then what about, I guess in this case, again, on the facts here, that you had one employee quit, one employee transfer, and another employee file a grievance as a result of what Mr. Groff was receiving in terms of treatment? How do we think about that, again, on applying whatever it is, substantial costs? How do we think about applying that to that circumstance? Sure. So just on the facts of this case, a quick clarification. There was one employee who transferred allegedly because of Mr. Groff. There was no other employee at his post office that transferred because of Mr. Groff. That's a little bit perhaps unclear in the government's brief, but that's at JA-64. But all of the things Your Honor mentioned would go into the evidentiary mix, and the employer could use all of that evidence to adduce whether, in fact, the employee's operations are being disrupted, whether it's unable to serve its customers, whether its workforce is not producing. Yeah, and I guess what's the answer? That's the hard thing. Sure. That's why I think I'm not going to the Chief Justice's maybe first question. When we toss out a standard from this case, substantial costs or from footnote 14, the hard thing is going to be how to apply it, and I'm not sure we can give you a full manual of how it's going to play out. Sure, Your Honor, but that's the words Congress chose in the statute. Undue hardship is necessarily a flexible and context-specific standard. That's one reason we'd urge the court to adopt it. So if we just say substantial costs, read footnote 14, substantial costs, go forth, courts. We think the court needs to give more guidance than that. That's why we like the significant difficulty or expense test, because you have New York and California and other states already applying that test for religious accommodations. There's case law out there. It's workable. If you read the ADA guidelines in the ADA manual from the EEOC, it's quite helpful in answering the questions that Your Honor posed about the effect of collective bargaining agreements, about the effect of individuals quitting or supposedly being overloaded with work. And, again, those are going to be fact-specific cases. Oftentimes they're going to go to a jury, but the employee is not always going to lose, and that's where we are right now with Hardison. Why shouldn't these go to a jury? I mean, Judge Hardiman thought they should. I mean, it seems to me the Court of Appeals didn't reach the MOU issue, and, you know, even if you assume that this is conduct to a business and that, you know, effects on coworkers don't automatically count, there's not a record here that shows that, you know, that it wasn't a substantial cost to the business. I just don't understand why we would decide that. Two points on that, Your Honor. First of all, of course, we would be happy if this court states the significant difficulty or expense test and remands for a trial. Second of all, there was substantial evidence in the record here, including the corporate representative's concession at pages 266 to 268 in the joint appendix, that accommodating Mr. Groff was not causing an undue hardship on the business, and you had the Holtwood Postmaster's contemporaneous e-mail at 316 to 317 in the record that says accommodating him is not causing an undue hardship. That would only arise if we scheduled him, knowing that somebody else wouldn't show up. Thank you, Counsel. Justice Thomas? Justice Alito? Put aside the question of whether it's legitimate to speculate about the reason for the reasoning in Hardison, do you think that there's anything illegitimate about discounting an argument about congressional acquiescence or congressional inaction when there's good reason to believe that a reasonable number of Congress would think that there would be constitutional problems with adopting the kind of remedial legislation that is positive? Yes, I think that would be an appropriate reason to discount an argument based on congressional inaction, particularly when you had witnesses at those hearings warning Congress that to adopt a significant difficulty or expense standard would call into question the constitutionality of Title VII. Do you think it's legitimate to lump together a request for accommodation that would contravene seniority rights with a request for accommodation that would have nothing to do with seniority but would arguably violate a collective bargaining agreement or a memorandum of understanding? Are they the same things? No, Your Honor, they're not the same things, particularly because Congress specifically carved out seniority rights from the duty to accommodate, and we're not challenging that holding here. It would be quite concerning to expand that to CBAs because that would allow unions and employers to negotiate away religious accommodation rights that are protected by the statute. Thank you. Justice Sotomayor? Justice Kagan? Can I ask you a couple of questions about how you think that your standard plays out? And one is a clarification question. I thought that I understood you to say that if an employer had to pay premium wages in order to find employees who could pick up the slack, so to speak, that that would not rise to the level of significant difficulties. Is that correct? We do not articulate that as a per se rule, Your Honor, but certainly in the mine run of cases which involve blue-collar workers, as our amici point out, we're talking about $100, $200 a week for a corporation of any significant size. That's not going to be an undue hardship. Okay. And then thinking about this question about burdens on coworkers, I mean, I basically understood you to say that burdens on coworkers, again, just did not count as a significant difficulty or expense. So let me just give you a hypo. It's similar to the fact of this case, but we'll just simplify it a little bit. You know, there's a rural grocery store, let's say, and it has three employees. And it's important to the grocery store that it stay open on Sunday. And one of the employees says, you know, I'm a Sabbath observer. But the other two employees are not thrilled about the idea of working on Sunday either. I mean, maybe they want to go to Little League games with their kids, or maybe they want to go to church too, but they're not a Sabbath observer and can't ask for this sort of accommodation, or maybe anything else. And so it's, you know, maybe they quit, or even if they don't quit, their morale is very bad, or even if they're just, like, great people and, you know, they manage to keep a stiff upper lip and smile every day, the employer just thinks, boy, this is just an inequitable situation, because all of these people really want to take Sundays off. And it's true that there's not a religious observance in place, although, as I said, there can be. I mean, some of these other employees might want to go to church on Sunday too. But, like, none of that can count. An employer, it's a three-person grocery store. None of it can count. Our position is not that it should not count. So let me try to lay out some background principles to answer that question. First of all, of course, Title VII only kicks in at 15 employees. So that may or may not ever arise. Well, it's just like this little post office. I mean, obviously the post office has more than 15 employees, but this little post office did not have more than 15 employees. This little post office was a rural post office with a few people trying to deliver the mail. But when you look at the broader context, that shows why this case is different, because for 40, from your hypothetical, because for 46 out of the 52 weeks of the year, the post offices were combined for purposes of assigning RCAs. There were 40 RCAs available to be assigned to 12 to 15 shifts each Sunday. So accommodating Mr. Groff for 46 out of the 52 weeks of the year would only have reduced the number of available assignees from 40 to 39. That's de minimis. Now, you're asking about the six weeks of the year. So it may be quite different for a grocery store year-round having to accommodate in that way. This is for six weeks out of the year, and even then, the local post office was able to borrow RCAs from other local post offices just in the way it did the rest of the year. So that's a very different hypothetical. In your case? So as I understand what you just said to me, that seems like a very different position from your brief. Your brief seems to me to be pretty hard line about you just can't take into account co-employee burdens. Are you backing away from that now? Well, we're not backing away because that's never been our position. We said that the effect on coworkers can be relevant evidence of an effect on the conduct of the business. So the employer can come forward with evidence that the morale issues or the quitting of an employee or the overburdened nature of the employee's work can be put forward as evidence, but it must show that there is some disruption to the operation of the business. That's the exact way the ADA applies it, as we point out on pages 43 and 44 of our brief. Beyond that, the employer— I mean, isn't there always going to be disruption to the business? Or, you know, employees conduct the business. So if employees are burdened, that affects the business. I don't think that's the right way to look at it for this reason, Your Honor. The question is, what's our yardstick or what's our metric here? And, yes, as a general rule, something that happens to an employee is going to have some effect at some minuscule or marginal level, possibly, or possibly a larger level. But the question is, what do we apply the undue hardship standard to? And that has to go to the business as a whole. The court shouldn't just leap from the fact that there's an undue hardship on a particular employer or employee to the fact that there's an undue hardship on the conduct of the business. Thank you. Justice Gorsuch? Justice Kavanaugh? One thing about this case that I think makes it a little more difficult is that there can be religious interests on both sides. Let me just pick up on Justice Kagan's questions. So you have a group of employees who are all religious, let's say, but the Catholic and the Baptist don't get it, don't get the Sunday off because they're told you're the wrong religion or you have the wrong religious beliefs versus the person who has the right religious beliefs to get the Sunday off. Does that matter? If I'm understanding the hypothetical correctly, you have one employee who has a strong objection to working on Sunday and others who do not. One who has a religious, say, your client, and then you have a Catholic who says, Well, I would prefer not to work on Sunday either, but my religion doesn't compel me not to work on Sunday, and a Baptist says the same thing and a Jewish employee says the same thing on Saturday. But that's not good enough, so your religion is not good enough. So there's a religious interest, arguably, in that sense, too, and some of the amicus briefs point that out. Is that irrelevant? Should we think about that at all? It seems concerning that you're told, in effect, you don't get Sunday off even though you're religious. The other guy next to you gets Sunday off because he's religious, but his religion gives him a little more benefit there. Certainly the statute does frame this in terms of the person who asks for the accommodation and believes their religious practice requires them to do something. And I think Congress understood that there is something different in kind about asking somebody to surrender their conscience or their job than it is about giving up a preference, even if it's a religious preference, but certainly as to secular preferences as well. Now, again, if the employees feel that that's unfair and they go to their employer and they complain or they quit, then that's something that the employer could put forward as evidence that could ultimately rise to the level of an undue hardship on the business if they can show concrete evidence on the operations of the business. So if those employees say this is unfair and morale starts going down, they make complaints, someone leaves, that's the kind of thing that you agree can be effect on the conduct of the business and therefore the employer can take that into account at that point. It can be evidence of effect on the conduct of the business, but morale or threats to quit or whatever the case may be needs to have a concrete effect on the operations of the business. I hate to belabor this, but what exactly does that mean? I think it's going to be a context-specific case-by-case analysis. What does that mean? I think it means the exact same thing it means in the ADA context. We cite the guidelines at pages 43 to 44. I mean, anyone running a business in America knows that morale of the employees is critical to the success of the operation. Sure, and I think the EEOC has rightly said in the ADA guidelines and the cases interpreting the ADA that morale itself is not enough. You have to show the morale's effect on how is the business effectively being able to serve its customers. Are the employees objectively overloaded such that they can't do their job? There has to be some actual evidence in the record that goes beyond morale, and it certainly can't be what we have here where the post office had an accommodation that was working and just abandoned it. Thank you. Justice Barrett? I have some of those same concerns because it seems to me in the ADA context, unlike this context, you may have fewer accommodation requests. I mean, you might have many religious people in a workplace seeking the same accommodation for Sundays off or other kinds of accommodations. And I guess it seems to me, as Justice Kavanaugh said, morale can be very important. It kind of seems to me that you're defining conduct of the business as the bottom line, like you want a dollar amount on it. So if you lose efficiency and you want to measure, like, well, we're not able to deliver as many Amazon packages, so it's costing us some of our contract. We're not able to sell as many groceries, or we have to close early on Sundays because we can't cover it and we're losing the sales, and that's part of the shift. I mean, what if it's just morale? You know, maybe employees aren't – I mean, in things that might be very difficult to prove and put a dollar amount on, employees aren't as productive because they're grumbling, they're not willing to kind of go the extra mile, put their best foot forward. Those might be very difficult things to put a dollar amount on, or the dollar amount might be small, but why wouldn't they be things that affected the conduct of the business? We do not advocate for a dollar amount test. It just needs to be concrete evidence that the employer is not able to carry out its operations, and that is something that the employer has the burden to prove. But we wouldn't accept, for example, in the ADA or in the Pregnant Workers Fairness Act context, that workers are upset because they're having to pick up a little bit of slack for their pregnant coworker or for their disabled coworker. So that comes up in all the cases, and the cases always say morale itself is not enough because that just opens up the floodgates. So give me an example of when it wouldn't be a dollar amount. When you say affect the operations of the business, that doesn't sound like – I realize you're saying morale isn't enough, but affect the operations of the business. Give me an example of when the effect on coworkers would do that. Well, when a coworker quits would be an obvious example. Quits because of morale, so it's just like morale has to get so bad, the employer has to wait until morale is so bad that employees actually quit. That's not our position, Your Honor, but that is an example of when morale would have a concrete effect. And we have the benefit of looking to New York and California, which has this test. And when do they say it's enough? It's similar to what's the case in the ADA. It's not enough to have morale issues. It's not enough to just have grumbling. But if the employer becomes shorthanded or the employees become so overburdened that they can't carry out their job, then that has an effect on the business. It doesn't need to be quantifiable in dollars and cents, but these are all context-specific cases. But it sounds to me like you're saying morale is not enough unless someone actually quits. So, you know, if on Friday it's very clear to the employer that morale is at an all-time low, it's not good enough. But on Monday, after one employee is actually driven to quit, then it's enough? No, Your Honor, the dividing line would not just be quitting. You hear about quiet quitting today or individuals who are so overburdened by an accommodation that they cannot do the work in the course of the day. Can I go to the reasonableness of the accommodation? I mean, I recognize that we've suggested that reasonable accommodation means something that eliminates the conflict between the religion and the duty that needs to be performed. But it seems to me that maybe this goes to reasonableness of the accommodation. If you're in the rural grocery store and the two other employees have to pick up all the shifts, maybe that's not reasonable? Or does it always have to be measured, in your view, under that substantial difficulty test? I think that's an important point, Your Honor, that under the reasonable accommodation prong, which, of course, is not before the court today, but the employer has flexibility to select an accommodation that's not the religious employee's preferred accommodation. And as part of making that reasonable accommodation, the employer can take into account the effect on the coworkers or take into account the effect on the business. And, of course, that's what we had here. This is not a get-out-of-work-free card for Mr. Groff. He volunteered to work on Saturdays. He volunteered to work on non-Sunday holidays. And it simply shifted around the shifts that individuals were working. Thank you. Justice Jackson? Yes. Sorry, can you hear me? Justice Kavanaugh asked you about the government substantial cost test. And I thought I heard you say, that sounds pretty good to me, but the problem is in the application. So I guess I'm trying to understand, is there any daylight between the test that you are advocating for, significant difficulty and expense, and the government's test, substantial cost? They seem pretty synonymous to me. So can you help me figure out the difference? Certainly, Your Honor. We know what significant difficulty and expense means because it's been applied under these other statutes, which employers are already applying every day in New York and California are applying. I don't know what substantial cost means because those are just two words on a page. The only way to tell what that means is to look at how the government applied them and how Hardison applied them. So do you have an example of, I mean, the government has written a brief. You've written a brief. There are two different standards in them. Can you give us an example of a case that would come out differently under the different tests? Certainly, Your Honor. Paying $100 a week to somebody to attract them to take on a Sabbath shift, that would probably not be an undue hardship under our test, especially for a larger employer. But that's the holding of Hardison, and that would be an undue hardship under the government's test. Denying a single co-worker's shift preference, the government says that that's an undue hardship. Because of substantial cost being the test? Well, that's a question for the government, I guess, how substantial cost links up with it. All right. Let me ask you another question then, just one more. With respect to the questions about the establishment clause and the shifting views as to what the Constitution permits, is there any impediment to Congress's acting now? I mean, setting aside the fact that there's been a change in terms of the court, presumably Congress knows that and could change the statute now, right? Absolutely. Congress could change the statute now. And the question is just whether this court should place on Congress's shoulders the burden of this court's error in Hardison. Well, that assumes that that's the reason why Congress picked this particular test. But, I mean, isn't this a policy question at bottom for Congress? And I guess I'm a little worried about the history of people going to Congress and the many, many bills. Apparently, you know, Hardison has been on Congress's radar screen for a very long time and they've never changed it. And I guess I'm concerned that, you know, a person could fail to get in Congress what they want with respect to changing the statutory standard and then just come to the court and say, you give it to us. Why shouldn't we wait for Congress? Now that the, you know, law has shifted, as Justice Alito pointed out, why isn't this the opportunity for them to act? We agree wholeheartedly that this is a policy question for Congress, but Congress answered that question in 1972 when it enacted the words, undo hardship on the conduct of the employer's business. So is that an impediment for Congress to revisit it today? Do they have a similar stare decisis scenario? No, of course Congress could address it today. And the question before the court is, of course, under the stare decisis factors, when the reasoning has been eroded, when the government's not even defending the reasoning of the test, whether this court should go to the text and interpret it in a way according with plain meaning. Thank you. Thank you, counsel. General Prelogar. Mr. Chief Justice, and may it please the court. For almost 50 years, courts have applied Hardison when analyzing undue hardship under Title VII. A substantial body of case law has developed to guide that context-dependent analysis, and that case law provides meaningful protection to religious observance. Petitioner asked this court to throw all that away and overrule Hardison, but he can't overcome the strong stare decisis weight this court gives to its statutory holdings. His argument boils down to a claim that Hardison was wrong because it insufficiently protects religious employees. But that is a policy argument that he should direct to Congress, and it ultimately reduces to the claim that it was wrongly decided, which this court has said over and over again is not enough in the statutory stare decisis context. Petitioner is also wrong about Hardison's effects. Lower courts and the EEOC have applied the more than de minimis cost language in light of Hardison's facts. That means that employers aren't required to regularly pay overtime wages or regularly operate shorthanded, but the EEOC's guidelines recognize that employers can be required to bear other costs like infrequent payment of premium wages, and the burden rests at all times on the employer to demonstrate undue hardship with concrete evidence, not with speculation. Applying those principles, lower courts frequently deny undue hardship defenses, so there is no justification now to dispense with Hardison and discard all of that precedent. Justice Kavanaugh, Justice Barry, you asked some questions about the facts here. The lower courts correctly found an undue hardship on these facts. Petitioner's job specifically required him to work on Sundays. Exempting him from work each and every Sunday would have violated his co-workers' contractual rights at the post office under that MOU as to how to allocate those undesirable Sunday shifts, and his absences created direct concrete burdens on other carriers who had to stay on their shifts longer to get the mail delivered. That caused problems with the timely delivery of mail and it actually produced employee retention problems with one carrier quitting and another carrier transferring and another carrier filing a union grievance. That is an undue hardship under any reasonable standard. I welcome the court's questions. General, this may be a problem unique to me, but could you explain to me why you think that Hardison decided a case under the amended Title VII? Yes, of course. When I look at the Court of Appeals opinion and the District Court opinions, they both refer to the regulations that are being interpreted. I think this court's decision in Hardison, Justice Thomas, clearly resolved the meaning of the 1972 version of the statute because there was an open question in the case about which version of the statute applied, whether 1972 or the predecessor version. Both Hardison and the U.S. government in the case said there was an issue of retroactivity and the 1972 statute should be applied in the case. And the court ultimately resolved that issue by saying the 1972 statute and its undue hardship standard carries the same meaning as the predecessor version as interpreted in the light of that EEOC guidance. So it was essential to the court's decision that it didn't have to resolve retroactivity, that it determined that the 1972 undue hardship standard had the same meaning as the standard it was applying in Hardison itself. And maybe another way to put this is to say that if there was any possibility of daylight with the 1972 statute having a higher burden on employers, a different undue hardship standard, then the court would have had to resolve that issue. It couldn't have been said it's unnecessary to determine which statute actually applies here because that could have been the make or break difference in whether Hardison prevailed. So I just don't think there's any way now to say that was dicta or this isn't a square holding on the meaning of the 1972 version. And that's, of course, what this court itself has recognized in cases like Ansonia Board of Education where the court treated Hardison as an authoritative interpretation of the 1972. Well, I just think it's difficult because when I look at the lower court opinions, they do not go through these gymnastics. But with that aside, if you just look at the words, the plain meaning of the words undue burden, in any other context, it could be in some of our constitutional cases or even under ADA, which I understand is defined differently. But how do you square that term, undue burden, with de minimis? I don't know how something you could say the standard is de minimis and at the same time that captures the undue burden standard that's in the statute. So I, of course, acknowledge that if you focused only on those terms more than de minimis in isolation, divorced from all of the analysis in Hardison, then I think it's imprecise and it could be subject to this kind of confusion. But our basic pitch here is that this is a context-based inquiry that necessarily requires the application of a standard like that to a particular fact pattern. And here, Hardison has properly been implied in the four-plus decade sense in light of its facts. This isn't some new interpretation that I'm suggesting for purposes of this case. This was the EEOC's determination just three years after Hardison in 1980 when it published its guidelines and said, we will interpret more than de minimis in light of the particular accommodations and the costs that the court confronted in Hardison. And as Justice Kavanaugh noted, the court alternated. It described it at other points in the opinion, in footnote 14, as substantial costs and substantial expenditures. So that has been the way that the EEOC and then the lower courts over 46 years have essentially, we think properly, interpreted that language in light of the context of the case. General, I'm really struck by your statement that regardless of what Hardison says, for the last 40 or 50 years, the EEOC and the lower courts have interpreted the decision in a way that properly respects the rights of minority religions. I'm really struck by that because we have amicus briefs here by many representatives of many minority religions, Muslims, Hindus, Orthodox Jews, Seventh-day Adventists, and they all say that that is just not true and that Hardison has violated their right to religious liberty. Are they wrong? They misunderstand what the lower courts and the EEOC has done? In our view, they're not accurately portraying how Hardison has actually played out in the lower courts and the substantial zone of protection for religious exercise that lower courts have recognized in light of Hardison. And if you are looking for more information to try to get a handle on the wealth of case law out there applying Hardison, I'd urge the court to consult the EEOC's compliance manual. We cite the manual throughout our brief, and it provides, I think, an excellent overview of the types of accommodation claims that come up again and again and the types of lines that courts have drawn through this context-based approach taking account of Hardison's facts. And it's just incorrect to say that there is not a substantial amount of accommodation happening and that courts are just reflexively denying these claims. All of these groups actually misunderstand the effect that Hardison has had on their members. Let me ask you a question about premium pay. I don't know whether that means premium pay or premium pay or premium pay. I don't know whether it's super duper premium pay. Let me give you a hypothetical. Say Amazon has to offer a $16 an hour rate instead of $15 an hour rate to get a consistent volunteer to take a Saturday shift for a Jehovah's Witness or an Orthodox Jew. Is that an undue hardship? So the line that we understand Hardison to have drawn is based on the idea that you would have to incur substantial overtime costs on a regular ongoing basis. And I don't think that it depends entirely on the ultimate, at the end of the day, out-of-pocket cost for the employer because I acknowledge in the Amazon example, even if it were a significant delta and it was much greater wages, Amazon could probably afford that. But instead, I think that this has to go to the nature of that type of accommodation. What's the answer to my question? It's $1 an hour more and it's Amazon. Or it's Walmart or it's the old TWA. But it's regular. Is that an undue hardship? Yes or no? I'm not sure that it would be proper to characterize $1 an hour differences as premium overtime wages. I think there'd be an initial fact question about the different levels at which Amazon reimburses its employees. Really, General, could you please answer my question? Premium doesn't mean just anything above the regular wage. Is that what you're saying? We're interpreting it the way the court focused on that in Hardison. There, I believe it was time and a half or maybe double time to fill those shifts, and the court characterized that as a regular payment of overtime wages that crossed the line. But it's not just about the out-of-pocket cost. I take that to mean that premium pay is not just anything more than the ordinary pay. It has to be substantially more than the ordinary pay, right? I think that that is consistent with the court's decision in Hardison. But I want to emphasize as well that the way that an accommodation ordinarily operates is to provide some kind of flexibility that allows the employee to complete his work requirements without having that conflict with his religious beliefs. And one of the reasons why I think the court drew this distinction with regular payment of overtime wages is that it's a different type of accommodation. It's exempting the employer on an ongoing, permanent basis from doing that portion of his work. So I think it actually tracks a little bit with the kinds of questions that Justice Barrett was asking about what's the nature of a reasonable accommodation in the first place, although I recognize that's not the way that the court thought about the issue in Hardison. General, I'd like to see if there's some common ground that we can work off of. First, you emphasize that any inquiry under the test here should be context-dependent. Yes. And I think your friend on the other side agrees with that. It's going to depend on the size of the employer, the nature of the request, what reasonable options are available to the employer, et cetera. That's right. So that's common ground. Okay. I think there's common ground, too, that de minimis can't be the test, in isolation at least, because Congress doesn't pass civil rights legislation to have de minimis effect. We don't think of the civil rights laws as trifling, which is the definition of de minimis. The law says since time immemorial that the law does not concern itself with trifles. Is that common ground as well? Yes, it is common ground. You should interpret that language in light of the facts there. Okay. And so I think, then, that takes us to a third question I have, which is I think your test is the substantial cost test and your friend's is the significant difficulty or expense test. Is that a fair summary of kind of the nub of the dispute? So I think I might be anticipating your next question, but I just want to clarify that I wouldn't call it a substantial cost test because we do have a concern with the court articulating some new verbal formulation if that calls into question the way that the commission and the lower courts have been applying Hardison for the past 46 years. We think that those results are consistent with the facts of Hardison and the court's observation there that it's substantial cost across the line. So I don't want to resist that at all. That is common ground. But I do have concern with the court overruling Hardison or at least suggesting that there's a brand-new standard with all of the details having to be filled in anew because we think that already that case law is drawing the right line. I think you are anticipating my next question, as you usually do. But substantial cost, that at least, it seems to me, in some abstract level is common ground. Fair? Yes. I would have conceded at the abstract level. And then the question becomes, do we need to, in this case, get into any verbal formulations, and you're encouraging us not to do so. That's right. And just to put it all out there, my concern is that any verbal formulation the court might choose as a replacement could potentially call into question this well-devolved body of law. But if you were searching for a verbal formulation. If we were simply to say that the courts, some courts have taken this de minimis language rather seriously, and no one before us defends it, and it wasn't even briefed in Hardison itself. That wasn't something that anybody advocated for, even in Hardison. Then maybe we could do a good day's work and put a period at the end of it by saying that that is not the law. I would agree with that, and I think that that could be a useful clarification for any courts that are led astray by that de minimis language. But I would urge the court. Remand the matter. I'm sorry to interrupt. And then remand the matter back and be done with it. If I could add one small piece on the remand, which is to please confirm that the EEOC has properly understood Hardison in light of the facts, and that the court is not overruling Hardison on its facts. I think that is really where the pressure point is. Do we need to do the pressure point? Okay, so I guess I would just wonder whether the court needs to get into that today. If there is so much common ground here between the parties, and really between the parties in Hardison, some courts, and it's been a serious misunderstanding, not all courts, but some courts have taken this de minimis language and run with it and say anything more than a trifling will get the employer out of any concerns here. And that's wrong. And we all agree that's wrong. Why can't we just say that and be done with it and be silent as to the rest of it? Well, I think Petitioner is asking this court to do much more. He's asking the court to overrule. And now you are too. I'm asking you to reject his argument. Okay, and he's asking you to reject yours, and perhaps maybe that's another day's problem for us. And it's a significant problem. But does the court need to go there? I mean, is there any necessity for us to do that? I think if this court made clear that the de minimis language should not be taken literally to mean every dollar above a trifle is immunizing the employers from liability, that is absolutely a correct statement of the law. It's consistent with Hardison. It does not require overruling Hardison. And I would be very happy with that clarification. Well, we do have to reach a disposition line. So how do we reach the disposition line on Justice Gorsuch's suggestion? So our view is that the facts here clearly qualify as an undue hardship under Hardison and under any reasonable understanding of the facts at issue in that case. And it's for all of the reasons I tried to explain. You know, this was not some minor inconvenience to the Postal Service. The request of accommodation here had manifold impacts both on coworkers and on USPS's ability. So there would be no basis for vacating and remand in light of this universal agreement that we're not talking about trifles? That's correct. There is no basis on which to conclude that we won on a trifle. It was far, far more significant than that. But why wouldn't we vacate and remand to let the Third Circuit know? Like, let's imagine that we took Justice Gorsuch's approach and said, you know, to be clear, and I think a lot of courts of appeals are, and in fact, the EEOC guidelines for employers, the more informal sheet, says anything but minimal cost. That makes it sound like trifling. So why wouldn't it make sense to vacate and remand and say, you know, to be clear, this is all assuming, right? But to be clear, de minimis doesn't mean trifling cost, any cost, minimal cost, unless you were, you know, maybe you were led astray by that and we want you to apply the Solicitor General's correct understanding of hardison, which requires you to assess whether there's a substantial burden, substantial hardship. At that point, I would just use the statutory language, undue hardship. Justice Barrett, obviously, I recognize that's an approach that's open to the court. I think that if you look at the Third Circuit's decision, there is nothing in there to indicate that the court's decision was driven by this idea that anything over a trifle was too much. Instead, the court carefully parsed the evidence in the case and pointed to the really significant impacts that I'm emphasizing here about co-worker burdens, people quitting, people transferring, there was a threatened boycott on one Sunday, and union grievance filed. So, you know, I think that ultimately, the Third Circuit would reach the right result again on these facts, and I don't think it's necessary to send them down that road. But I, of course, acknowledge if you wanted to provide this clarification and send it back. Let me ask you just one other question. I guess one thing that concerns me about your proposed approach is that, you know, Justice Gorsuch said, and that's why basically no one's defending this. I mean, we have an amicus brief from Americans, you know, Americans for Separation of Church and State saying that Hardison was wrong. Since no one's defending the test, and I feel like you're going back and you're rationalizing it and you're saying, here's why what the EOC has said is consistent with a more robust understanding of the de minimis test that Hardison announced. You know, here's this body. I mean, are we supposed to go back and look at this body of 40 years of court of appeals law and assure ourselves that, in fact, it's consistent with this test? If this language, de minimis, has been leading courts of appeals astray, what is the point of retaining that formulation of the standard, which everybody agrees has led courts of appeals astray? So I recognize and don't want to suggest that I have particular attachment to the four words more than de minimis in isolation, but I do have great attachment to the body of law that has developed in reliance on Hardison and using the costs and the accommodations at issue there as one benchmark to try to sort out going forward the types of accommodations that will be required. So the thing I'm trying to avoid is this idea that the court would just throw it all up for grabs and say, we have to do this over under some new standard, and this case law is irrelevant for helping to guide employers in understanding their obligations and courts in applying the statute in those recurring fact patterns. Well, you want to look at the development of the law. Of course, the law has developed in this area in other respects, too. It is not the case, as I think people thought it was at Hardison, that you can't treat people's religious exercise any better than anyone else. In other words, strict neutrality is no longer understood to be the law. It was not the case when Hardison was decided that you had cases like Hosanna Tabor and Espinoza and Carson saying there really is no establishment clause problem if you make accommodations for people's religious belief. So if you're going to look at this under current law, it's not clear that those cases would come out... Hardison, for example, would come out the same way. In other words, if we're going to do this and say de minimis doesn't really mean de minimis. It means something more significant. If you're trying, if you're in the lower courts and you're trying to figure out, well, what exactly does that mean, you will, of course, have to take into account our religious jurisprudence as it exists today, right? Yes, but I don't think that there is any evidence that the lower courts themselves have misunderstood Hardison to apply a strict neutrality principle or to rest on these kinds of establishment clause concerns that appear nowhere on the face of the decision. So I don't think that those developments in the law call into question what the lower courts have done, looking instead at that separate question of when do the particular burdens and costs on an employer cross that line and are rightly characterized as undue. And, in fact, this kind of strict neutrality principle, if it had really been what the court in Hardison intended, would have made it wholly unnecessary to engage in any analysis of undue hardship. So I don't think that that's a tenable right to... No, go ahead. General, how do you respond to counsel on the other side's point that we have undue hardship working in other statutes and that there's a whole body of law related to the significant difficulty in expense test? So if we're going to be revisiting Hardison anyway, even to clarify it in the way that Justice Gorsuch suggests, what's your response to his suggestion that we take that test since it also has case law that has developed? So let me respond with some practical concerns about trying to transplant ADA case law to this area, but then I'd also like to take a shot at describing why I think that would be legally flawed here. Just on the practical point, it's not possible to pick up and uproot the ADA case law and transplant it in full to this new context. And the reason for that is because there are signals in the ADA itself that Congress had in mind for very different potential types of accommodations, things like having to modify your existing facilities and undergo costly renovations to make them accessible to those with disabilities or hire an entire additional employee to function as a sign language interpreter. And I don't think it would be reasonable, given the differences in the statutory structure, to say, well, that's not available in Title VII, but we're still going to say that the ADA case law carries its full meaning. Instead, what you'd have to do is start over and you could use significant difficulty in expense, but at that point you recognize that there's daylight between the statutes and it's a content-less standard. You're still going to have to engage in all of the hard work of deriving meaning by applying the standard to repeat back patterns. That's the work that's already been done under Hardison in a way that we think is very much protecting religious exercise in the workplace, so I don't think it makes sense to start over under the ADA. So you don't think there's confusion that is deriving from having different undue burden standards operating with respect to different types of alleged discrimination? No, not at all, and I think it could actually boomerang into additional confusion if courts try to take the ADA standards but recognize that there were pieces of that that are wholly inapplicable and can't transfer over. And just on the legal piece, if I could finish up on that, I think there's a real problem here when we're in the context of statutory stare decisis where the court had already authoritatively interpreted Title VII and Congress then came along after and enacted the ADA and recognized that its definition of undue hardship was a departure from what the court had done and how Title VII operated. It would then be particularly anomalous for the court to say, we're going to go ahead and port over the ADA definition even though Congress has been repeatedly asked to do so with bills introduced in every Congress between 1994 and 2013, many to codify this precise standard, and Congress did not enact those bills. In general, can I take you back to something that you said to Justice Gorsuch and Justice Barrett because when you were agreeing that this is not a line about, you know, trivialities. But then I think you said at some point, but it would not be a good thing just to say, oh, well, what, you know, so now it's a substantial burden test going forward and leave it at that. And why is that? Right. Our concern with that is if the court were to announce a new standard, I think it would come with all the costs of destabilizing this area of the law and unsettling whether the court means to overrule Hardison on its backs, for example, or potentially call into question all of the established areas of law that have developed that we think have drawn the right lines here. And if I could, there are really only three categories where religious accommodation requests come up again and again, and I think it might be helpful to the court if I provide a really quick summary of those three categories because I think it shows how the law has developed in this area. The first category is scheduling changes. That can include things like Sabbath observance, obviously, but also things like midday prayer breaks or wanting to come in later on a Sunday to permit church service. And in that area, courts regularly are requiring employers to provide flexible work schedules if the work can be shifted to a different time of day. So you take your midday prayer break, but then you make it up on the back end. That is what courts are doing today. Also, you can facilitate voluntary shift swaps. That is a common way to deal with Sabbath observance. And if those fail, you can consider lateral job transfer to a different position where there's not the Sabbath conflicts for that accommodation. In the second category, it's dress and grooming policies. And there today, courts are regularly granting accommodations and rejecting undue hardship defenses. The narrow category of cases where that's not happening is when there's a legitimate safety concern, like you work in a steel mill and you can't modify the dress code because wearing a skirt will interfere with operating the machinery, for example. The third category involves religious expression in the workplace. This can include displaying a religious symbol or potentially needing an exemption from employer-sponsored religious speech at a meeting. There, too, courts are regularly granting accommodations, and it's only in the circumstances, for example, where the religious speech would amount to harassment of coworkers or customers that the undue hardship defense is credited. And, General, you think all three of those categories, under a proper understanding of the law, whatever standard, verbal formulation one chooses, are required by Title VII? Yes. We think that accommodations in those categories are frequently granted in line with Title VII undue hardship defenses are frequently denied in line with Title VII, and what I'm asking the court to do is not disrupt and unsettle that area of the law. And I don't think your friend on the other side wants to unsettle those decisions either, right? So that's, again, a little more common ground amongst us. So I worry that he does, because he is asking this court to adopt a brand-new standard. He has a different account. He says his claim is that Hardison has been a disaster on the ground. We do not think that that is reflected in the actual case law, certainly not in the commission's experience in this area. But in those, I'm sorry to interrupt, but in those three buckets, I think there's common ground that the law would require those kinds of accommodations you just outlined. So I'm not so sure. For example, let's take the facts of this case. Petitioner obviously thinks that he was entitled to an accommodation, even though... I don't want to take the facts of this case. I want to take your three buckets. I like them. Okay? I'm looking for common ground here, and it seems to me that is common ground, that a proper understanding of Title VII requires those, even if sometimes they're more than de minimis. All those things could be more than de minimis, and yet both sides agree that that's what Title VII should require. Yes, and if Petitioner is happy with the EEOC's guidance and with the case law in this area that summarizes those three buckets, then that is absolutely common ground. Is this case in the first bucket? Are you saying that this case is in the first bucket? Exactly. A requested scheduling change. So Sabbath cases fall in the first bucket. You're not saying that all cases in the first bucket require an accommodation. You're saying some cases in the first bucket require an accommodation. Yes, of course. I was trying to give them a sense of that. And then there's a big difference as to which cases require an accommodation. So I'm happy that we're all kumbayaing together. My arguments didn't always go that way. I'm sorry. I just wanted to follow up with one quick thing, and that is I know there are a number of states. We have a brief from, I think, 17 states that have something like a substantial cost or a substantial burden and undue expense test as a matter of state law. Are you aware, and this is just a practical on-the-ground question that the government might be, has there been any problem in the administration of those state law tests? So I think it's far fewer than 17. The examples that have been cited are New York and California. No, I think we have 17 states. Yes, pointing to those laws. Pointing to those laws. But it's a small number of states that have those laws. New York and California are the examples my friend has cited. We looked at every reported decision in those cases, and there are just really few decisions. Many of the cases tend to apply and draw on the Title VII standards that already exist. So it's not clear that actually the courts in those states, even though there's different language, are applying a radically different standard. Okay, thank you. In the follow-up on these questions in the first bucket, my understanding is you want the line to be regularly paying premium wages would be an undue hardship. Or regularly operating shorthanded was the other thing the court considered. Okay, and on regularly operating shorthand, I just want to make sure. A lot of times in your brief it just says operating shorthanded. A few other times it says regularly operating shorthanded. It's regularly operating shorthanded? Yes, I'm glad to have the chance to clear that up. The EEOC has drawn a distinction between temporary accommodations, including temporarily being shorthanded or paying premium wages first. And, of course, applying that to a particular set of facts is challenging, as Justice Alito's questions and others have pointed out. But that's the line you would draw in the first bucket. That's right. Those are some of the lines. Now, of course, there are other types of requests that can come in, and so I don't want to speak kind of categorically here because it's so context-dependent. But I was trying to give a sense of the accommodations that are regularly offered day in and day out, and rightly so. And then on what you want us to say as to the standard, you haven't mentioned footnote 14 a lot, but is footnote 14 equivalent to more than de minimis costs, in your view? Is that what Hardison was saying? Yes. I think Hardison was alternating between describing these costs in various formulations. It used more than de minimis in the portion of the opinion that, of course, this Court has now focused on, but it also used substantial costs in that footnote. In the footnotes? Oh, wait. You just agreed, I think, with Justice Kavanaugh that regularly paying premium wages would be an undue burden. Is that right? That was a holding in Hardison, yes. But your discussion earlier, I forget with which colleague of mine, you couldn't really tell us what premium wages were. So your agreement on that being an undue burden is not very helpful for me unless we have some idea about where the agreement is. So give me a test for deciding whether something is a premium wage. So I would look to the facts of Hardison, which we think are the best indication here, and of course is entitled to statutory stare decisis effect. If I'm recalling the facts correctly there, the evidence was that you would have to pay time and a half on an ongoing basis for the duration, and the court said that's an undue hardship. And I acknowledge maybe there could be hard questions in this context-dependent analysis in the future about whether a $1 bump-up in salary should be considered premium, and we're not trying to make a global argument here, but because it's so fact-dependent and context-dependent, but I think that the EEOC has rightly relied on the facts of Hardison to give a benchmark. Justice Thomas? General, could you point me to the part of Hardison that synchronizes its consideration of the regulation with the new statute, the amended statute? Yes. I am flipping through the opinion here because it's in one of the footnotes, Justice Thomas. Well, that's okay. You can do it later. Okay. In our brief, we cite the relevant portion of Hardison where the court made clear that it was interpreting both versions of the statute to have parallel meanings, and that was the exact reason why the court didn't have to resolve the issue of retroactivity. I think it might be footnote 11, but I'm sorry I'm not finding it. Okay. Justice Alito? Well, your three buckets are quite helpful, and I think the argument has been productive in finding points of agreement. I just wanted to follow up on a few things. In your second bucket, you have grooming standards. So let me take you back to a situation like the one in Abercrombie. You have an employer who generally prohibits employees from wearing anything on their heads, but a Muslim woman says, I'm required for religious reasons to wear a scarf on my head. And this links up with the issue of the reaction of coworkers. Suppose that the employer gets a fierce reaction from coworkers when it says that it's inclined to provide an accommodation for that Muslim woman. What would you make of that situation? So I would point to the EEOC guidance, which directly addresses this point and makes clear that mere coworker grumbling or resentment or even overt hostility to religious practice and expression in the workplace is not itself cognizable to factor into the undue hardship inquiry. Instead, coworker effects are relevant only when the accommodation is creating concrete burdens on the coworkers that's materially changing their terms and conditions. Okay, suppose that then the employer has more difficulty. Employees quit. Say, this employer accommodates Muslims, and so we're quitting. And it has more difficulty hiring people. What about that? So that also cannot factor into the undue hardship analysis because it would be giving effect to religious hostility and animus, and the guidance on this point is clear also. Would the employer have to inquire into the reasons why these employers are quitting? So if the employees say, we're quitting because we just want to wear hats, because it's fashionable. Okay, you couldn't take that into account. But they say, we're quitting because we don't want to accommodate Muslims. Then that would not be permissible. Actually, neither of those should be taken into account. When the nature of the coworker's dissatisfaction is just the mere fact that an accommodation is being provided on religious grounds, the guidelines make clear that that's not a cognizable form of hardship. And instead, it's only when the coworkers express this dissatisfaction because they are actually being asked to take on additional work or have more undesirable shifts, for example, that that would be relevant to undue hardship. Another question. What, in your view, is the relevance of the fact that a requested accommodation would be inconsistent with a provision of a collective bargaining agreement or a memorandum of understanding that doesn't have anything to do with seniority? So we think that Hardison clearly held in the first holding that I didn't previously understand Petitioner to be challenging, but maybe now at argument he is, that it held that when there are terms of the collective bargaining agreement that fix employees' rights vis-a-vis one another, including by assigning undesirable work through a neutral system, whether that's seniority or rotation or lottery, that it would be an undue hardship to strip employees of their rights under that kind of collective bargaining term. But Hardison did actually say, quote, We agree that neither a collective bargaining contract nor a seniority system may be employed to violate the statute. Right? And it's hard to see how it could say, put aside the question of seniority, which is treated separately under Title VII, it's hard to see how it could say otherwise with respect to a collective bargaining agreement or a memorandum of understanding, right? Yes, of course. And so it's not as though you could adopt an overtly discriminatory term or even one that's motivated by discriminatory animus and immunize that from scrutiny in a collective bargaining agreement. And I think that Hardison recognized that point in this interpretation. All right, suppose that a collective bargaining agreement or a memorandum of understanding says the employer will never grant a religious accommodation if it requires anything more than a de minimis effect on the employer. What about that? I would draw a distinction, and I think this is supported by Hardison, between terms in collective bargaining agreements that are fixing the employee's rights as it relates to one another, things like allocating the scarce resource of weekends off, on the one hand, and other terms that aren't granting employees any rights and therefore you wouldn't be taking their rights away, but rather are just the employer codifying certain rules. I don't understand Hardison to reach your hypothetical or to reach that latter category. Instead, the rationale of the court was that when you have a term of a collective bargaining agreement that is essential to maintaining labor peace, like figuring out which employees are going to have to pick up these undesirable shifts, they can legitimately rely on the terms of that agreement and not have their rights taken away. I'm not sure I really understand that. So if this provision, which requires strict neutrality and therefore adopts the de minimis test for all its worth, de minimis means de minimis, that affects both the employees who might want a religious accommodation and those who don't want one and might want a comparable accommodation for a secular reason. Well, I think that, you know, to fit within Hardison's first holding, it would be necessary for the term of the bargaining agreement to vest certain employees with particular rights. That's the contractual right not to have to work those shifts, for example. And if I'm understanding your hypothetical, the provision in the bargaining agreement would just be protecting the employer. It wouldn't be giving the employees themselves any kind of rights. All right, suppose it does give... It says secular employees shall have the same accommodation rights as those employees... Employees who may request an accommodation for a secular reason have exactly the same rights as an employer who requests an accommodation for a religious reason. So at that point, I think if you're accommodating the religious reason, it would just create a parallel or matching right that the person who wants the exemption from the dress code to wear the hat can do so. You wouldn't be taking away the right from the religious person. On the facts of this case, in your first bucket, you say voluntary shifts are fine, okay? And if there are people who will voluntarily shift out of the goodness of their hearts, okay, great. What if there's nobody who will do it for that reason? But they will do it if they get a little bit more money. So on the facts of this case, do we have any idea how much more it would have cost the Postal Service, which is a huge employer, it's not a profitable one, a profit-making one, to induce enough people to agree to cover the shifts? Do we know? Is it irrelevant? So there wasn't record evidence developed on this point, and that wasn't an argument that Petitioner pressed, as far as I'm aware, below about the payment of overtime to try to incentivize additional employees to volunteer. But there was a lot of record evidence about all of the effort the Post Office put in to try to arrange those voluntary shifts. The Postmaster, each and every Sunday that Petitioner was scheduled, was calling around to the other regional Post Offices trying to find volunteers, and I acknowledge that it didn't work each and every Sunday. That's why Petitioner had the conflict, but the lower courts correctly credited the good faith of the Postal Service in trying to put into effect an accommodation. But doesn't this most of the time come down to dollars and cents? So if the employer is willing to pay people to take a shift, then the shift can be covered, and everybody will be happy. The employee who wants a religious accommodation gets a religious accommodation, and the other employees who cover the shift, they get more money, and so they're happy. So doesn't it come down to dollars and cents, and don't we have to deal with the issue of dollars and cents? Isn't that what this mostly will come down to? First of all, there is certainly nothing that would prohibit an employer from choosing to pay extra to try to induce others to work those shifts and cover them. So that's one available alternative out there for certain employers that can afford it and think that that would be a way to address this issue. But I guess the question then becomes, what about the employers for whom that is going to be a struggle or who don't think that that is appropriate when they've hired someone specifically to work and be available on Sundays? Should the statute impose on them the regular requirement in perpetuity for the length of the employment to pay those extra wages? Hardison said no, and I think that's entitled to statutory stare decisis effect. Okay, I take that to mean that if it would be a struggle, then the employer can't be required to pay extra. But if it wouldn't be a struggle, then maybe the employer may be required to pay extra, right? No, and I'm sorry if I was unclear on this point. We think that this hypothetical fits squarely within Hardison's first holding. I'm sorry, it's first holding about the regular payment of premium wages, having to pay time and a half on a regular basis in order to fill that slot. And the basic insight behind that, I think, is that you have hired somebody to do a specific job and the nature of the conflict, if you can't fix it with all of these other solutions that I've offered in bucket one, would then effectively mean the person can't do a portion of the job they were hired to perform and it would transfer to the employer the responsibility to pay a lot extra in order to get that filled. Thank you. Justice Sotomayor? What's clear to me after all this discussion is that as much as some people might want to provide absolute clarity, there is none we can give, isn't there? Because it's all contextual. Yes. And to that end, there are going to be some cases where people are going to be unhappy with the court's result and others where they are happy. The best we can do is do what Congress told us to do, just to say that undue hardship excuses an employer from doing that, correct? Exactly. I think you put your finger on it, Justice Sotomayor. And regrettably, yes, the post office hasn't run for a profit, has not worked for a profit in many, many years. There's even questions of closing it down. And even that dollar extra could close it down. And one could argue that paying a premium wage by Amazon makes no difference. But at a certain point, we affect the corporation's bottom line and that's not our choice to decide whether we want to do that because the economy needs to run on incentives to make money, doesn't it? Yes. And so you're right. What Hardison said was there are certain broad categories affecting someone's seniority rights, affecting a regular premium wage or regular shorthandedness is going to affect morale no matter how you look at it. Anyone who's seen delivery people work during the holidays, if you pay any attention, most of them are exhausted at the end of their day. It costs to run extra hours. And it costs to do more work. And that cost can't be quantified always in money. So if we take the Hardison rules or holdings, that's enough, isn't it? Yes. And you don't have to speculate about how that applies on the facts of this case because here the record evidence showed that during the peak season when Petitioner was unavailable, it was one other carrier who had to go out each and every Sunday over the holidays to deliver the mail. And when he was unavailable, it was the postmaster himself who had to do it on three occasions. And that led to real-world costs on the other employees. There was similar evidence in the Lancaster hub. My friend suggested it was just a de minimis burden there, transferring as between 40 and 39 employees. But the record demonstrates that given the nature of the work and the number of RCAs who had to be on duty, they were working at least every other weekend, and the testimony showed it was often two out of three weekends. And so once you start taking away their weekend off, that led to the unrest and the disruption of the workflow that we saw here. And when Petitioner was absent, they had to stay on their routes longer and later, going out after dark for routes that were unfamiliar to get those packages delivered. That counts as real-world impact and undue hardship under any reasonable standard. Thank you. Justice Kagan? Jevron, the EEOC guidance gives relatively clear guidance as to this question of premium wages or the opposite. It does not give much guidance, at least the portions that I've read, about how it is that one is supposed to think about the burdens on co-employees. So could you tell me what the EEOC has done in this area, how it thinks about this, and how that is different from Petitioner's? Yes. So the first line that the EEOC has drawn is to distinguish between the types of impacts on co-workers that are relevant. And this goes back to my responses to Justice Alito. Mere co-worker grumbling or resentment that someone else is getting an exemption from a neutral policy is not sufficient and cannot factor into the analysis of undue hardship. That's equally true for actual actions like quitting or transferring if it's motivated by just being unhappy that there's a religious accommodation requirement out there or by actual religious animus. So you take those impacts off the table. And then what the EEOC guidance teaches is that this, like everything else, falls on a continuum. And so I can't give you categorical bright lines of exactly the point at which co-worker impacts are going to suffice to show undue hardship, but it's clearly the case that it's going to be relevant how many workers there are, how diffuse the burdens can be spread, what the concrete evidence shows about how the other co-workers are materially having their workplace changed and the way that that affects the conduct of the business, whether you see things like the disruption of the workflow and the workspace here as the lower courts credited. So as I have said many times, and I realize I'm a broken record on this, there's a lot of case law out there. But in this context where we're talking about burdens on co-employees, meaning that they'll have to work more or they'll have to work different hours than they otherwise would have, you know, what is the difference between your view and Mr. Street's view on that? So I think I understand him to say that that is, perhaps he would say it would rarely rise to the level although he holds open the possibility that you could take that into account in maybe extreme cases. You know, I don't know that he's staked out a clear position on exactly when those impacts count other than to agree with us that of course it's context dependent. And so I want to be clear that we're not suggesting that any time a co-worker has to pick up one extra shift in a blue moon that that's going to show undue hardship. It doesn't work that way. It's not a categorical rule. But as the burdens on co-workers increase, as you have an identified small pool of carriers in this little rural post office, it's not surprising to see that the burdens actually manifest into things like quitting and transferring and filing grievances. Thank you. Justice Gorsuch, just I hope a quick question about premium wages. This case of course involves the post office trying to serve Amazon's needs on Sunday. And I understand the post office's financial plight. But what if the facts are that the employer has to pay a premium wage to get anybody to work on Saturday or Sunday and you do have a religious employee who wants to take either Saturday or Sunday off because of their sincerely held religious beliefs? So that, yes, the employer is always going to have to pay a premium wage, but it's going to have to pay a premium wage for Saturday and Sunday work no matter what because it's just hard to get anybody to work those days because some people want to go to church and others want to go to their kids' soccer games. Would that be proof enough for the employer to escape undue burden under your test? No, not at all. If the employer is paying the same amount regardless just because weekend days require the payment of premium wages and if the employer is able to secure someone else to fill in for that portion of the work, then I don't think the employer would have a valid undue hardship defense. Thank you. Christos Cavanaugh? Sorry, I have several questions. First of all, on substantial costs, that was in footnote 14. That's, I think, responding to the dissent's concern in Hardison and saying substantial costs. Do you agree that that's the same as more than de minimis costs for purposes of Hardison? Yes, I think the court was using those terms interchangeably. Okay, and then how exactly do we say that without destabilizing the law is the concern you've raised. I guess your answer to that is we need to say more about the first bucket, regularly operating shorthanded, regularly paying premium costs. Is that how we solve the destabilization concern from saying substantial costs has always been the test? So I think the way to preserve stability in the law in this area while also cleaning up at the margins any confusion that's been produced by the de minimis test for the court to say that Hardison is an interpretation of undue hardship that is inherently a qualitative context-based standard and so the use of the language the court had there, which alternated between substantial and more than de minimis, can only actually take its greater meaning from looking at the facts of that case. The EEOC and the lower courts from 1980 onwards for more than 40 years have properly applied Hardison in light of its facts, and to Justice Gorsuch's point, to the extent any courts out there are reading this literally to mean de minimis means you never have to accommodate that is wrong, that is inconsistent with the current state of the law, and the court makes clear that's not what Hardison meant. And then I think, you know, to fill in the details, Justice Kavanaugh, I don't think there's a way for this court to try to top down, do that, with the limits of language that exist in this context space. Instead, I think the way to preserve stability is to make clear that you don't need to redo all of the work that's been done for five decades under the Hardison standard as properly understood. Do you understand undue hardship? I understand that term in the original statute to reflect a balance between two important values, one, religious liberty, and the other, the rights of American businesses to thrive. And to thrive, you have to be able to make money. Is that how you understand undue hardship? I certainly understand it to recognize that there are interests on both sides of the balance, but we don't think that the standard requires trying to measure the interests of the employer, for example, as against the significance of the employee's religious practice. The concern with that is that it's just incommensurable interest, and there's no real way for courts to conduct that balance. And so I think the right way to think about it is Congress struck the balance. It recognized that it is important to protect religious practice and liberty in the workplace. It created this duty to accommodate, but up to the line of undue hardship. And then to figure out what's undue, you look only at the employer's side of things to figure out when the costs become inappropriate or unwarranted. Two more. The MOU. How does it apply in this case? Does it control this case? We think that it absolutely controls this case. The district court squarely held, and there is no way to get around the district court's actual findings or its understanding of the meaning of the MOU in this case because I think that it's evident from its plain terms that the MOU created this strict rotation system for Amazon Sunday delivery. It was carefully negotiated with the bargaining unit of the postal carriers because these were undesirable shifts, and it sets out three exceptions, none of which apply here. My friend says maybe those aren't exclusive, but the whole point in having this carefully delineated scheme is to create these rights of employees so that they can rely on it for purposes of knowing when they have to work on Sunday. Last one. The three buckets were helpful. I just want to confirm, the second and third buckets, which were dress and grooming and religious symbols and the like, you were pretty clear there. I just want to double-check that offense by coworkers is not a basis there for preventing the employee from wearing certain symbols or certain kinds of dress. Maybe that's too absolute. Right, that's a little too absolute because there are situations, for example, where you're the front-door man, and if you want to put up a symbol, it could be attributed to your employer, so if there's confusion about whose speech it is, that might be an exception. So I don't want to speak too categorically. I just wanted to emphasize that to the extent Petitioner is painting a picture here that you just can never do any of this and none of it's accommodated, that is wrong. Thank you. Justice Barrett? So you've said a number of times, and it seems clear that this is a contextual inquiry, but it seems to me that there's one bright line that you are asking for that you're pulling out of Hardison, and that's money. And I understand your answers to some of the questions, especially to Justice Alito, to be anything more than you would otherwise pay, even if it's $1 an hour to the Amazon person. Under Hardison, it's your understanding that that's a premium wage because it's more than they would otherwise receive. So I appreciate the chance to clarify. I don't think I would draw the line quite that bright, but I do understand Hardison to have suggested that that is an inappropriate and unwarranted type of accommodation, and I think it's not just because of the cost. In fact, you can imagine scenarios like the one Justice Alito posited where maybe the costs don't seem that significant. Instead, I think it really goes to what I was trying to say earlier, that it's about the nature of the accommodation. You're just excusing someone from doing part of their job, and you're transferring to the employer the ongoing requirement to have to fill that spot and pay more to do so in getting a replacement worker in there. I guess I don't see why it's ongoing. I mean, a contextual inquiry would say we might treat the rural grocery store differently than we would treat Amazon, or maybe our financially floundering post office gets treated differently than Amazon. But circumstances can change. The context can change. And why can't the employer come back and say, well, I've been accommodating you by paying someone else a dollar extra an hour or a time and a half or whatever it is, but things have changed and I can no longer offer you that accommodation. Why does it have to be in perpetuity? So I certainly think if there were evidence to suggest that this is just going to be a temporary problem, you have new people who are starting two months down the road, and you can see that at that point you're going to be able to get voluntary shift swaps or something like that, of course that can be taken into account. And so I don't mean to suggest that those types of contextual considerations are off limits. It's just that to the extent that it's a request for an accommodation in perpetuity that requires payment of overtime wages, I think Hardison was trying to shut the door on that. Well, I guess my follow-up question to that response would be, so you're saying that requiring the employer and saying that the law requires the employer to pay, if it's temporary because it's going to be for two months only, that that might not be an undue hardship. However, if the employer says, yes, I'm going to make this reasonable, this accommodation is reasonable, it's not an undue hardship for now, but six months from now there's an unanticipated change of circumstances, I guess what I'm saying is it seems to me like it would always be implicit that I will offer you this accommodation so long as it's not an undue hardship. But how can anyone anticipate that maybe in six months' time suddenly they would be short-staffed and shorthanded? So I guess your argument has a lot more force if you assume that it necessarily would be in perpetuity as opposed to something that could be revised if circumstances changed. Well, certainly in your hypothetical, I think that the employee would get the accommodation because it's not an undue hardship at time one. Even if it's time and a half. Oh, so I understood you to be saying that if the employer is choosing voluntarily to supply the accommodation. No, no, no. Well, I'm saying even if it winds up being court-ordered. Because you're saying that the court could never say that that's what was required because any premium wage and a premium wage is any money more, $5 more, $5 a week. You're paying more than you might otherwise pay. So I understand you to be saying it's a bright line. If there's not an end date on it, that's pretty short. Am I misunderstanding? So I think the reading of partisan is that the regular payment of time and a half, that was the premium wage issue there, the court determined was an undue hardship. And footnote, Justice Kavanaugh was talking about footnote 14. In footnote 15, the court also says that the argument that that money was, the defense argument that that money wasn't a problem, also fails to take account of the likelihood that a company as large as TWA may have many employees whose religious observances require that accommodation. So it wasn't about just the one. It was about the possibility that there would be many. And maybe there would be, maybe there wouldn't be. I mean, it was different for the post office to try to accommodate his Sabbath request in this rural office than it might be in New York City. So I guess I'm just wondering why we have to make the line as bright as you're asking us to make it. That seems contextual. So I certainly agree that one of the relevant contextual considerations is how many employees need the accommodation based on not just speculation but concrete evidence, and that is reflected in the EEOC's guidance. I interpret that part of Hardison to say it comes after the court had already said that on these facts, Hardison was demanding something that would cost substantial costs associated with the regular payment of overtime or stripping other employees of their contractually bargained for seniority rights. And so this point about other employees was just an additional fortifying consideration that it would be undue for TWA given the prospect that other employees would likewise need the accommodation. Okay. Justice Jackson? It sounds to me similar to what Justice Sotomayor said, that whether any kind of accommodation is going to be required under any set of circumstances, you know, the answer is it depends. Is that right? I mean, it's all context-specific. And so can you just answer your responses to all of the various hypotheticals that we've asked you about, are they coming from your understanding of how Hardison has been applied by the EEOC and the courts? It's not just you standing there saying, this is what I think about a particular scenario, right? Yes, absolutely. I am relying heavily on and drawing from the EEOC's guidance and its lived experience with implementing Hardison for the past 50 years, as well as the body of case law that's reflected in the EEOC guidance that I keep pointing to. So we may find, if we were to delve into that body of case law, the answers to some of these questions, or at least what the EEOC thinks about how this should be applied. And your concern is destabilizing that set of determination. Exactly. And it gets to the colloquies we've been having about the limits of language in trying to articulate a standard in this context. No matter what, as your question touched on, Justice Jackson, this is context-dependent, and it is going to require an assessment of that individual employer's facts and circumstances. And I think that that hard work of filling in the details has largely been done and that the court should not take steps to unsettle it now. Thank you. Thank you, counsel. Mr. Street? This court should not apply the strong medicine of statutory stare decisis, where it's at best unclear that the court had before it in Hardison the current version of the statute. And it certainly should not apply those doctrines when the government is not even defending the test by its terms or defending the neutrality rationale of Hardison. So the question before the court is then, which new test is going to be applied? I wish I could agree with the government's rosy view of how lower courts have applied Hardison. A lot of that view seems to be coming from the EEOC, but it's quite notable that the EEOC has not joined this brief, as it has in many other civil rights cases. This court should reject the government's watered-down test for undue hardship. It will provide inadequate protection for religious liberty in the workplace, and it will even gut Sabbath accommodations, the very accommodation that was at the center of the 1972 amendment. And the reason is because that test is still inextricably tied to Hardison's de minimis language and to Hardison's holdings. My friend has repeatedly defended those holdings as written. Therefore, they're defending at least three propositions. Weekly overtime for a single employee to substitute for a Sabbath observer is an undue hardship. That's the holding of Hardison even in the context of TransWorld Airlines. That does not line up with any statutory meaning of undue hardship. Denial of any co-worker ship preferences is an undue hardship under the government's position, because that would require compelling somebody to work when they don't want to. And maybe the most striking is that my friend says that any alteration of a CBA is going to be a per se undue hardship. So that means, as Justice Alito elicited, if the employer and the union simply frame their CBA as being a rotation system, there will be no accommodation for Sabbath observers to be able to take their day of rest. My friend refers to the destabilizing of case law, but she admits that the case law has already gone off the rails, at least in many courts, are not protecting religious liberty because they're taking the de minimis test by its terms. So we're just left with which new test is going to be applied, and we think the right answer is to go to the plain meaning text of the statute. I have not heard a single word about the text of undue hardship. I have not heard any textual analysis from the government. I've heard a lot about buckets. I've heard a lot about different scenarios and holdings of hardison, but that cannot be defended as a matter of the text. In the United States today, employers are already applying a web of accommodations under a variety of statutes, the Americans with Disabilities Act, the Pregnant Workers Fairness Act, USERRA. These employers know how to apply the significant difficulty and expense standard, and it will not be a problem for them to apply that to religious employees, including as to morale issues. And the government today has not given us any reason why religious employees should have less accommodation than all of those other individuals protected under the other statutes that share the same reasonable accommodation and undue hardship framework. Thank you, counsel. The case is submitted.